FILED
2013 May-29 PM 12:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| MIKE ELDER, | |
| Plaintiff, | |
| v. | Case No. 2:11-cv-02097-RDP |
| DRS TECHNOLOGIES, INC., | |
| Defendant. | |

**FIRST AMENDED COMPLAINT**

For his Complaint, Plaintiff alleges as follows:

**I.   THE NATURE OF THE ACTION**

1. Mr. Mike Elder ("Elder"), Plaintiff, brings this action pursuant to the False Claims Act, 31 U.S.C. Section 3729, *et seq.*, e.g., 31 U.S.C. Section 3730(h), to recover compensatory damages, special damages, and all other relief available under the Act.

2. The Defendant, DRS Technologies, Inc., ("DRS"), has engaged in systematic fraud against the United States of America which is violative of the civil False Claims Act, 31 U.S.C. Section 3729 *et seq.*

3. The violations of the False Claims Act arise in this case because Defendant, DRS

1

Technologies, Inc., has engaged in numerous fraudulent practices, which are more fully explained herein.

4. Mike Elder brings this action as a former employee of DRS Technologies, Inc., who alleges that he was discharged from employment with DRS because of his "whistleblower" complaints about DRS's violations of the False Claims Act.

5. During the time period involving these allegations, Elder was physically on the ground in Afghanistan and has personal detailed knowledge of the fraudulent schemes of Defendant, as detailed herein.

6. Elder has satisfied all pre-requisites under the Act prior to filing the instant Complaint.

## II. JURISDICTION

7. This action arises under the civil False Claims Act, 31 U.S.C. Section 3729 *et seq.* Consequently, this Court has federal question subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331.

8. This Court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because the Defendant, DRS Technologies, Inc., transacts business in this Judicial District.

## III. VENUE

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the Defendant, DRS Technologies, Inc., resides, can be found, or transacts business in this Judicial District.

**IV.    THE PARTIES**

<u>**RELATOR: MIKE ELDER**</u>

10. Mike Elder is a citizen of the United States and of the State of Alabama and is a resident of Cragford, Alabama.

11. Elder was employed by Defendant, DRS Technologies, Inc., from October 22, 2007, until November 9, 2009.

12. Elder was physically located in Afghanistan from November 2007 until he was sent home in October 2009, and then he subsequently was terminated for retaliatory reasons, in violation of subsection 3730(h) of the Act.

13. Elder was employed with DRS Technologies, Inc., as a telecommunications specialist — what DRS employees referred to as a "technician."

14. The primary job of a telecommunications specialist is to install and instruct the Afghan National Police ("ANP") forces on the use of HF, UHF, and VHF communication equipment.

15. More specifically, Elder's primary day-to-day responsibilities included, for example, installing two-way radios in Afghan police vehicles, installing radio towers throughout Afghanistan, testing and organizing telecommunications equipment at the warehouse in Kabul, and teaching the Afghan police how to use telecommunications equipment.

16. Because existing Afghan telecommunications infrastructure was weak or non-existent, it was important to outfit the Afghan National Police with quick efficient ways to communicate with each other.

17. The contract described below filled this need and selected DRS Technologies, Inc., to help build the ANP telecommunications infrastructure.

18. Elder's work helped the ANP utilize better communication throughout Afghanistan.

19. Elder's work, as well as the work of other DRS employees, took place both in Kabul and in the field in various parts of Afghanistan.

20. Elder spent much of his time in the main warehouse in Kabul doing various activities, as well as in the field, primarily installing new equipment, radio repeaters, and training the ANP on proper use of radios.

21. Elder began work for DRS after being approached by Rick Floyd while working for KBR (Kellogg, Brown and Root) in Iraq. Although Elder frankly lacked any specific credentials in establishing HF or VHF telecommunication systems, he was hired by DRS to perform work under this defense contract.

22. Elder learned of the instant allegations of fraud and False Claims set forth herein while employed at DRS Technologies, Inc.

23. Elder resides at 46101 Highway 49, Cragford, Alabama 36255.

**DEFENDANT: DRS TECHNOLOGIES, INC.**

24. Defendant, DRS Technologies, Inc., headquartered in Parsippany, New Jersey, is a worldwide defense contracting company specializing in technology in various areas. According to the DRS website,

> DRS Technologies…is a leading supplier of integrated products, services and support to military forces, intelligence agencies and prime contractors worldwide. Focused on defense technology, the Company develops,

manufactures and supports a broad range of systems for mission critical and military sustainment requirements, as well as homeland security.

The Company has been recognized as one of the fastest growing defense technology companies in the world and holds leading market positions in thermal imaging devices, combat display workstations, electronic sensor systems, power systems, rugged computer systems, air combat training systems, mission recorders, deployable flight incident recorders, environmental control systems, telecommunication systems, aircraft loaders, military trailers and shelters, and integrated logistics and support services.

DRS's broad range of mission critical systems and sustainment solutions uniquely position the Company to support the ongoing superiority of the military's Current Force, as well as the modernization and emerging transformation initiatives of the Future Force.

DRS responds to the needs of U.S. and allied military forces, as they engage in day-to-day expeditionary activities, by providing high-tech products and systems that improve the capabilities of many key platforms. The Company also provides a range of military support systems and services. DRS's products are deployed on a wide range of high-profile military platforms and on several platforms for non-military applications.

## V. THE FEDERAL CIVIL FALSE CLAIMS ACT

25. The Federal Civil False Claims Act (hereinafter "FCA"), as amended, provides in pertinent part that:

> (a) Any person who (1) knowingly presents, or causes to be presented to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false or fraudulent

> claim paid or approved by the Government, or (7) knowingly makes, uses or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government,....
> is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, plus 3 times the amount of damages which the Government sustains because of the act of that person.
>
> (b)  For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) had actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.
>
> (c)  For purposes of this section, "claim" includes any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for an portion of the money or property which is requested or demanded.

31 U.S.C. § 3729.

## VI. DEFENDANT'S FALSE AND FRAUDULENT CLAIMS

26. DRS Technologies, Inc., submitted false and fraudulent claims for payment to the United States in the following ways.

27. In brief, it has knowingly fraudulently and falsely charged employee labor hours to task orders under the federal government contract discussed below.

28. From early 2005 until October of 2007, Elder was employed with KBR, Inc. (a Halliburton subsidiary), as a light vehicle mechanic and, later, as an internet cable

6

technician, deployed in various locations in Iraq.

29. Although happy with his employment in Iraq, he was approached by Rick Floyd in September 2007 (via unsolicited email) about coming to work for DRS Technologies, Inc.

30. At the time, Elder was not familiar with DRS, but his resume had been passed along to Mr. Floyd (unknown to Elder at that time) by a former KBR supervisor, whom had recently left to work for DRS.

31. Although inexperienced in the areas for which DRS needed technicians, Elder was accepted by DRS for a position as a telecommunications specialist.

32. At first, Elder was excited about this new opportunity and encouraged that he was working for a reputable company.

33. His assignment would fall under a defense contract DRS was awarded in 2003, a United States Army Communications Contract – believed to be labeled: DAAB07-03-D-B013.

34. The contract at issue was apparently issued to Technical & Management Services Corporation (TAMSCO) on 1/31/2003 (US Army Communications-Electronics Command, CECOM Acquisition Center, Catherine DiMatteo). Subsequently, Elder believes that DRS purchased TAMSCO in approximately 2006.

35. The initial contract was awarded in the amount of $701,259,543.00. These funds came directly from the Treasury of the United States Government.

36. Only days into Elder's employment, he began to notice some DRS practices that unsettled him.

37. Soon thereafter, he began to complain, both verbally and in writing, that some of the corporate practices of DRS were wrong, and potentially illegal, as well as unethical.

38. The first such practice, and the one that unsettled Elder most, was DRS's habit of requiring all employees to charge 12 labor hours daily, regardless of actual time worked.

39. Such practice was fraudulent, resulted in the submission of false claims to the United States Government, and resulted in funds being fraudulently and wrongfully extracted from the United States Federal Treasury. When Elder complained and reported these false claims to his superiors at DRS, DRS knew at that time that the filing of a False Claims action, by either the employee or the government, was a distinct possibility.

**OVER-CHARGING FOR HOURS NOT WORKED**

40. The first category of false claims perpetrated by DRS on a widespread and systematic basis is over-charging for labor hours that were never actually worked.

41. This occurred for each employee based in Afghanistan under this contract.

42. In contrast to the number of hours actually billed, Elder estimates, and can prove specifically in many cases, that most employees only actually worked about 5 to 6 hours a day, and none on Fridays.

43. Elder estimates that DRS employed approximately 30 full-time telecommunications specialists (technicians) over his tenure.

44. It is also important to note that each DRS employee charged time for 12 hours every

day, seven days a week, although DRS employees were off every Friday for "alternative duty location."

45. After Elder's many complaints, and the fact that he would often go in to work on Friday's without anyone else, DRS's policy changed to allow Friday as a regular work day after the firing of Rick Floyd.

46. Elder initially insisted that he work on Friday, though he would work alone with everyone else back at Camp Eggers or otherwise going shopping or out to local bars.

47. However, Elder was finally told he could not work on Fridays after he showed up at the warehouse one Friday and witnessed Dan Roelofs' vehicle damaged from a drunk driving incident the night before and Rick Floyd carrying a case of beer and two bottles of liquor into the warehouse.

48. At one point, Elder actually began to meticulously document the systemic overcharging by DRS employees.

49. The document captures in detail the fraud perpetrated by DRS — employees always charging for 12 hours of work, when they actually only worked about 5 or 6 hours a day. (*See Exhibit A*).

50. Elder first began to speak out about the over-charging concern to his superior, Dan Roelof, around the first part of December 2007.

51. He approached Mr. Roelof saying that he wanted to work all day, and on Fridays, or be deployed into the field.

52. Mr. Roelof told Elder that it was "no big deal, this is just the way things work."

53. Roelof further added that Elder could not be deployed into the field and that he lacked experience necessary to be deployed.

54. In response to the directive of Mr. Roelof, Elder (only) began to charge his time accurately, only for those hours worked (i.e., the 5 or 6 hours a day that all employees spent at the warehouse).

55. This prompted Roelof to confront Elder, instructing him to go back and change his recorded time, putting 12 hours for each day, instead of only hours he actually worked.

56. The very next week, Elder was deployed into the field, to eastern Afghanistan. This action was targeted and directed at Elder as retaliation for his whistle-blowing activities, in violation of subsection 3730(h) of the Act.

57. The process of charging time to this contract at DRS was simple and straightforward.

58. Each employee was instructed to charge their time to the underlying contract on a daily basis — 12 hours for each day, irrespective of hours actually worked.

59. DRS had an on-line internet system for tracking and charging employees time, called Deltek.

60. Sensing that DRS would continue to charge the government for hours and time never actually worked, Elder made an effort to specifically document this billing fraud for a certain time period in Kabul — on a day-by-day basis.

61. Elder's spreadsheet tracking this fraud from November 15, 2007, to January 1, 2008, is attached hereto as *Exhibit A*.

62. As shown, it was the required policy of DRS for each employee to bill 12 hours each day. However, as reflected on Elder's spreadsheet, it was common for employees to only work 5 to 6 hours a day, and be off all day on Fridays.

63. Elder's spreadsheet details the precise working hours for all Kabul employees for this select time period.

64. Since Elder was always the first to arrive each morning, and since everyone always left together, he was able to determine in each case, for each employee, the exact working times for these employees. Again, this documentation is based on Elder's own specific personal knowledge and personal observation.

65. After Elder repeatedly expressed his concerns about the fraud going on at DRS, he spent the last portion of his employment mostly in the field – in retaliation for his complaints about DRS's fraud.

66. In 2009, DRS's Bill Howell deployed Elder to Kandahar for 3 to 4 months with no work to do – in retaliation for his complaints about DRS's fraud.

67. In fact, there was no reason for DRS to be stationed at the Kandahar airfield base at all. Relator spent this time doing next to nothing for 3 to 4 months.

68. During this time too, Elder was instructed by DRS to charge 12 hours a day to the contract.

69. Later, Elder was deployed to Barge Matal, a very dangerous area known for intense fighting against the Taliban. This action was in direct retaliation for Elder's whistleblowing threats and activities.

70. In fact, Ricky Ruiz, the DRS supervisor at the time, even refused to give Elder a

security report before going into Barge Matal — a standard procedure before every mission.

71. Mr. Ruiz simply told Elder: "you'll find out when you get there." The retaliatory nature of this directive was obvious and palpable to Elder.

72. Elder arrived in Barge Matal to find a raging battle between US and Coalition forces and the Taliban or Al Quada.

73. He was told by the US Military that civilians had no business in being there (especially unarmed), but the fighting was too extreme to safely transport Elder out of the area.

74. Elder survived six direct and three indirect sniper shots, among a host of other gunfire and RPG rounds. Elder's life was in serious danger on several occasions while attending to DRS's concocted "snipe hunt." Elder suffered severe mental anguish and other emotional damages as a result of DRS's actions and retaliations.

75. Elder was forced to leave the battle area, and he was provided a military escort for three days until he made the next plane to Dubai.

76. Later, back in the States, Elder received official word that he was terminated from DRS, despite receiving a special commendation from a US Army officer for his bravery and efforts in Barge Matal.

77. Elder was terminated and discharged by DRS specifically because he reported the fraudulent activity and called out his superiors on the same.

## VII.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### False Claims Act: Retaliation, Discharge, Termination
### 31 U.S.C. § 3730(h)

78. Plaintiff Mike Elder hereby re-alleges, repeats and incorporates the allegations in paragraph 1 through 77 as if fully set forth herein.

79. DRS violated 31 U.S.C. § 3730(h)(1), which provides: "Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter."

80. Elder took actions in attempt to rectify DRS's fraudulent billing activities, e.g., by complaining repeatedly to superiors. These actions were "protected activity" under the Act.

81. DRS had knowledge of the "protected activity," and DRS knew, at said time, that the filing of an FCA claim was a distinct possibility because these fraudulent activities had been taking place for months, at least, and the US government had paid on DRS's fraudulent claims.

82. Elder was retaliated against due to his "protected activity" attempts to stop DRS's illegal actions. Therefore, DRS is liable to Elder for wrongful termination/retaliation under section 3730(h).

83. Defendant, DRS Technologies, Inc., by or through its agents, officers, subcontractors, or employees, acted against Elder in direct violation of subsection 3730(h) of the act by discharging, demoting, threatening, harassing, and in other ways discriminating against Elder because of his protected activity in trying to stop fraud.

84. By virtue of the actions of Defendant, DRS Technologies, Inc., Elder has suffered damages including economic damages for lost wages and back pay, mental anguish and emotional suffering, and other damages, and is therefore entitled to all other relief available under the False Claims Act, 31 U.S.C. § 3730(h) *et seq.*

## VIII. PRAYER FOR RELIEF

**Wherefore**, Plaintiff Mike Elder respectfully requests this Court to enter judgment against Defendant DRS, as follows:

85. That pre-judgment and post-judgment interest be awarded.

86. That those reasonable attorneys fees, costs, and expenses, which the Plaintiff necessarily incurred in bringing the action, be awarded.

87. That Plaintiff be awarded all economic damages sustained because of DRS's violations of subsection 3730(h) of the False Claims Act.

88. That Plaintiff be awarded special damages for mental anguish and emotional suffering sustained because of DRS's actions in violation of the Act.

89. That Plaintiff be awarded all other compensatory damages available under the Act.

90. That Plaintiff be reinstated with the same seniority status he would have had but for the discrimination.

91. That Plaintiff be awarded all damages necessary and appropriate pursuant to subsection 3730(h) of the Act, including compensatory, nominal, and punitive damages.

92. That the Court grant any other relief as may be proper and just.

93. That the style and caption of this action be changed to reflect that the only plaintiff is "Mike Elder," solely in his individual capacity.

Wherefore, Plaintiff demands judgment in an amount to be determined by jury.

*s/James R. Moncus, III*
James R. Moncus, III

*Attorney for Plaintiff-Relator*

**OF COUNSEL:**

**HARE, WYNN, NEWELL & NEWTON, LLP**
2025 Third Avenue North, Suite 800
Birmingham, Alabama 35203
Tel: (205) 328-5330
Fax: (205) 324-2165

## JURY DEMAND

Plaintiff Mike Elder demands trial by jury.

*s/James R. Moncus, III*
James R. Moncus, III

*Attorney for Plaintiff-Relator*

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 29, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: Richard Davis, Esq., MAYNARD, COOPER & GALE, PC, 1901 6th Avenue North, Suite 2400, Birmingham, Alabama 35203 and via email to Andy Liu, Esq., CROWELL MORING, 1001 Pennsylvania Avenue, NW, Washington, DC  20004-2595, Email: aliu@crowell.com.

             *s/James R. Moncus, III*
             James R. Moncus, III