IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

MIKE ELDER,                        )
                                   )
                                   )
      Plaintiff,                   )
                                   )
         v.                        )   1:13cv799 (JCC/TRJ)
                                   )
                                   )
DRS TECHNOLOGIES, INC.,            )
                                   )
      Defendant.                   )


**M E M O R A N D U M   O P I N I O N**

This matter is before the Court on Defendant DRS
Technologies, Inc.'s ("Defendant" or "DRS") Motion to Dismiss
Plaintiff's First Amended Complaint ("Motion"). [Dkt. 42.]  For
the following reasons, the Court will deny Defendant's Motion to
Dismiss.

**I.   Background**

A.   Factual Background

Defendant is a defense technology company that
supplies integrated products, services, and support to military
forces, intelligence agencies, and prime contractors worldwide.
(Am. Compl. [Dkt. 30] ¶ 24.)

Plaintiff Mike Elder ("Plaintiff") worked as a
telecommunications specialist (also known as a "technician" by

1

DRS employees) for Defendant from late October 2007 to early November 2009 and was located in Afghanistan for the majority of that time, from November 2007 to October 2009. (*Id.* ¶¶ 11-13.) Plaintiff's work for Defendant was pursuant to a defense contract that Defendant had with the United States Army to build the Afghan National Police's telecommunications infrastructure. (*Id.* ¶¶ 17, 33.) As a telecommunications specialist, Plaintiff's primary job was to install the telecommunications equipment and instruct the Afghan National Police on how to use it. (*Id.* ¶¶ 14-15.)

Plaintiff alleges that he observed and complained about violations of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729, *et seq.*, during his employment with Defendant and that Defendant retaliated against him in response to these complaints, culminating in his termination. Specifically, Plaintiff alleges that Defendant required all employees to charge 12 labor hours daily, regardless of actual time worked, and that it was standard practice for all employees to do so. (Am. Compl. ¶¶ 38, 44, 49, 58, 62, 68; Ex. A to Am. Compl. [Dkt. 30-1].) Plaintiff also alleges that in actuality, most employees only worked five to six hours per day. In addition, most employees did not work on Fridays, pursuant to Defendant's policy that employees were off every Friday for "alternative duty location," and instead allegedly spent Fridays recreating

"back at Camp Eggers or otherwise going shopping or out to local bars."  (Am. Compl. ¶¶ 42, 44-46, 49, 62; Ex. A.)

Plaintiff claims that he investigated and documented this allegedly fraudulent conduct during his employment by keeping a log of the hours that employees actually worked in contrast to the amount entered on their timesheets under Defendant's timekeeping policy.  (Am. Compl. ¶¶ 48-49, 63-64; see Ex. A.)  Plaintiff also asserts that he complained, both verbally and in writing, multiple times to his employers about Defendant's allegedly illegal timekeeping policy and practices.  (Am. Compl. ¶¶ 37, 45, 50-55, 65.)  He alleges that he first protested the timekeeping practices early in his employment with Defendant by raising his concerns with his supervisor, Dan Roelof, on or about December 12, 2007.  (*Id.* ¶ 50; Ex. A.)  At that time, he indicated that he was uncomfortable with the practices and that he wanted to either work all day and on Fridays or to be deployed into the field.  (Am. Compl. ¶ 51.)  In response, Roelof allegedly told him that the timekeeping discrepancies were "no big deal, this is just the way things work" and that he could not be deployed into the field yet because he lacked the necessary experience for deployment.  (*Id.* ¶¶ 52-53.)  Following this conversation, Plaintiff began charging his time accurately based on the five to six hours he actually worked each day.  (*Id.* ¶ 54.)  Soon after, on or about

3

December 21, 2007, Roelof confronted Plaintiff about his timekeeping and instructed him to go back and change his recorded time to 12 hours per day instead of the amount of hours he actually had worked. (*Id.* ¶ 55; Ex. A.)

One week after this conversation and two weeks after Plaintiff's original discussion with Roelof about Plaintiff's timekeeping concerns -- a discussion in which Roelof informed Plaintiff that he was too inexperienced to be deployed into the field -- Plaintiff was deployed to eastern Afghanistan. (Am. Compl. ¶ 56.) Plaintiff alleges that Defendant deployed him in retaliation for his complaints about Defendant's timekeeping practices. (*Id.*)

Plaintiff alleges that he continued to "repeatedly" express his concerns about Defendant's allegedly fraudulent timekeeping practices. (*Id.* ¶¶ 37, 45, 65.) He claims that Defendant subsequently deployed him for the majority of the last portion of his employment in retaliation for these complaints. (*Id.* ¶ 65.) For example, Plaintiff alleges that Bill Howell, another one of Defendant's employees, deployed him to the Kandahar airfield base for three to four months in 2009. According to Plaintiff, there was no work for him to do at that the base and no reason for him to be stationed there. (*Id.* ¶¶ 66-67.) He states that Defendant instructed him to charge 12 hours per day to the government contract while there, despite

4

the fact that he spent almost no time actually working. (*Id.*
¶ 67-68.)  In addition, Plaintiff alleges that Defendant also
deployed him to Barge Matal, a dangerous area known for intense
fighting against the Taliban.  He asserts that, contrary to
Defendant's standard procedure for deployments, his then-
supervisor Ricky Ruiz refused to give him a security report
prior to his deployment to Barge Matal and told him "you'll find
out when you get there." (*Id.* ¶¶ 69-71.)  Plaintiff claims that
when he arrived in the area, there was an ongoing battle and
military personnel told him that unarmed civilians should not be
in the area but that current fighting was too extreme to
transport him safely out of the area. (*Id.* ¶¶ 72-73.)  After an
unspecified period of time there during active hostilities,
Plaintiff was forced to leave the battle area and provided with
a military escort out. (*Id.* ¶¶ 74-75.)  According to Plaintiff,
he received a special commendation from the United States Army
for his bravery and efforts while at Barge Matal. (*Id.* ¶ 76.)

        Soon after arriving back in the United States,
Defendant informed Plaintiff that he was terminated. (*Id.*)
Plaintiff asserts that his termination ultimately was in
retaliation for his reports and complaints about Defendant's
allegedly fraudulent conduct. (*Id.* ¶ 77.)

B.   Procedural Background

On June 15, 2011, Plaintiff filed the Complaint in the United States District Court for the Northern District of Alabama. [Dkt. 1.] Relevant to the motion at issue, the Complaint contained three explicitly labeled causes of action brought under the FCA's *qui tam* provisions: presentation of false claims in violation of 31 U.S.C. § 3729(a)(1) (Count I); making or using a false record or statement in violation of 31 U.S.C. § 3729(a)(2) (Count II); and conspiring to defraud the United States in violation of 31 U.S.C. § 3729(a)(3) (Count III). The Complaint also contained factual allegations referencing retaliatory discharge in violation of § 3730(h) of the FCA and the prayer for relief included a request for "damages necessary and appropriate pursuant to subsection (h) of the Act," but the Complaint did not specifically list the § 3730(h) retaliation claim in its "Causes of Action" section. The United States declined to intervene in the case on October 9, 2012. [Dkt. 10.] The Northern District of Alabama unsealed the Complaint on December 7, 2012. [Dkt. 11.]

On May 16, 2013, Plaintiff filed a Motion for Leave to File A First Amended Complaint [Dkt. 23], which the Northern District of Alabama granted on May 29, 2013 [Dkt. 28]. On May 29, 2013, Plaintiff filed the Amended Complaint. [Dkt. 30.] The one-count Amended Complaint consists only of a retaliatory

discharge claim under the FCA, 31 U.S.C. § 3730(h), and drops the FCA *qui tam* claims present in the original Complaint.

On April 25, 2013, Defendant moved to transfer venue to the United States District Court for the Eastern District of Virginia. [Dkt. 13.] The Northern District of Alabama granted that motion on June 14, 2013. [Dkts. 34-35.] On June 28, 2013, the Northern District of Alabama transferred the case to this Court. [Dkt. 36.]

Following an extension of time to file an answer or otherwise respond to the Amended Complaint, Defendant timely filed the Motion to Dismiss Plaintiff's First Amended Complaint and accompanying memorandum in support on July 31, 2013. [Dkts. 42-43.] Plaintiff filed his opposition on August 12, 2013 [Dkt. 46], and Defendant replied on August 19, 2013 [Dkt. 48].

Defendant's Motion is before the Court.

## II.  Standard of Review

Federal Rule of Civil Procedure 12(b)(6) allows a court to dismiss those allegations which fail "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A Rule 12(b)(6) motion tests the legal sufficiency of the complaint. *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). A court reviewing a complaint on a Rule 12(b)(6) motion must accept well-pleaded allegations as true and must construe

factual allegations in favor of the plaintiff.  *See Randall v. United States*, 30 F.3d 518, 522 (4th Cir. 1994).

A court must also be mindful of the liberal pleading standards under Rule 8, which require only "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8.  While Rule 8 does not require "detailed factual allegations," a plaintiff must still provide "more than labels and conclusions" because "a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007) (citation omitted).

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to meet this standard, *id.*, and a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ."  *Twombly*, 550 U.S. at 555. Moreover, a court is "not bound to accept as true a legal

conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678.

## III. Analysis

Defendant argues that the Amended Complaint should be dismissed for two reasons: (1) it is barred by the relevant statute of limitations; and (2) Plaintiff fails to allege facts sufficient to plead the protected activity and causation elements of a FCA retaliation claim.  The Court will address each argument in turn.[1]

### A.   Statute of Limitations

Under the pre-2010 version[2] of the FCA's retaliation provision, 31 U.S.C. § 3730(h), the Supreme Court held that FCA retaliation claims were subject to the "most closely analogous state statute of limitations." *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 545 U.S. 409, 422 (2005).  The parties agree that regardless of whether the Court applies Virginia or Alabama state law, the limitations period is two years.  *See id.* at 419 n.3 (listing the most analogous state laws for each of the 50 states for statute of

---

[1] Defendant also argues that Plaintiff's claim for punitive damages should be dismissed as an inappropriate remedy under the FCA's retaliation provision. In his opposition brief, Plaintiff concedes this issue and withdraws his claim for punitive damages.  At the hearing on August 23, 2013, Plaintiff confirmed that he was withdrawing his request for punitive damages. Accordingly, the Court will consider this damages request withdrawn.

[2] In 2010, the Dodd-Frank Act amended 31 U.S.C. § 3730(h) to add an explicit three-year statute of limitations.  31 U.S.C. § 3730(h)(3) (2010).  The parties agree, and the Court concurs, that the amendment is not retroactive and therefore the pre-2010 version of the FCA's retaliation provision applies here.  (*See* Mem. [Dkt. 43] at 4 & n.4; Opp. [Dkt. 46] at 9.)

limitations purpose); Va. Code Ann. § 8.01-243(A) (two year statute of limitations for actions for damages caused by fraud), Va. Code Ann. § 8.01-248 (two year personal actions catch-all statute of limitations); Ala. Code § 6-2-38 (two year torts catch-all statute of limitations); Ala. Code § 36-26A-4(a) (two year statute of limitations for state employee whistleblower claims).

Defendant contends that Plaintiff's retaliation claim is time barred because (1) it first was raised in his Amended Complaint almost four years after Plaintiff's employment with Defendant ended and (2) the retaliation claim does not relate back to the original complaint which was filed within the two year limitations period. The Court disagrees.

The Court concludes that contrary to Defendant's assertions, Plaintiff's original complaint stated a FCA retaliation claim under § 3730(h). Under Rule 8 of the Federal Rules of Civil Procedure, to plead a claim a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief" and a "demand for the relief sought." Fed. R. Civ. P. 8(a)(2)-(3). As Defendant notes, Plaintiff did not specifically list a retaliation claim in his "Causes of Action" section of the Complaint. (Reply [Dkt. 48] at 2; Compl. [1] Sect. VII. "Causes of Action.") Nonetheless, despite this technical failure, the Complaint in practice states

a claim for retaliation when viewed as a whole and construed liberally.[3]   It does not, as Defendant contests, contain only a "handful of random allegations" that are "buried" and "not sequentially presented." (Reply at 2-3.)   Instead, the Complaint specifically alleges a violation of the FCA's retaliation provision, asserting that Plaintiff was "terminated for retaliatory reasons, in violation of subsection (h) of the Act." (Compl. ¶ 15.)   The Complaint supports this legal conclusion with at least 25 paragraphs of factual allegations which substantially mirror those stated in the Amended Complaint, allegations which the Court below concludes adequately plead a § 3730(h) retaliation claim.   (*Compare* Compl. ¶¶ 15, 41-43, 46, 52-60, 69-80 *with* Am. Compl. ¶¶ 4, 12, 37-39, 42, 48-56, 65-77.)   In addition, the Complaint's prayer for relief explicitly seeks damages for a retaliation claim, requesting that Plaintiff "be awarded all damages necessary and appropriate pursuant to subsection (h) of the Act." (Compl. ¶ 96.)   As Plaintiff's "original complaint (i) referenced [§ 3730(h)] explicitly and (ii) pled facts that, if proven, would be sufficient to show a prima facie case of retaliation in

---

[3] Judge Proctor of the United States District Court for the Northern District of Alabama observed in his memorandum opinion on Defendant's Motion to Transfer Venue to the Eastern District of Virginia that the Plaintiff did not list a § 3730(h) retaliation claim "among his causes of action" in the original Complaint.   Such an observation does not conflict with this Court's conclusion that the Complaint, when viewed as a whole and construed liberally, contained a retaliation claim.   The issue before Judge Proctor was whether the court should transfer venue for the Amended Complaint, not whether the original Complaint properly pled a retaliation claim.

violation of [§ 3730(h)]," the Court finds that the "original complaint meets the pleading threshold articulated by Rule 8" and that any "new facts [in the Amended Complaint] do not assert a new cause of action" but rather "simply amplify the [§ 3730(h)] cause of action [Plaintiff] inartfully attempted to plead in his original complaint." *Perry v. American Airlines, Inc.*, 405 F. Supp. 2d 700, 705 (E.D. Va. 2005).

Based on the Court's conclusion that the original Complaint raised a § 3730(h) claim for retaliatory termination, Plaintiff's retaliation claim is not time barred.  Plaintiff's employment terminated on November 9, 2009.  (Am. Compl. ¶ 11.) He filed his original Complaint less than two years later, on June 15, 2011.  [Dkt. 1.]  As a result, Plaintiff brought his retaliation claim within the applicable two year limitations period.

### B.   Pleading of FCA Retaliation Claim

In addition to creating civil liability for presenting, making, or using "a false or fraudulent claim for payment or approval by the Government," 31 U.S.C. § 3729(a)(1)-(7), the FCA includes a provision creating a cause of action for employees who suffer retaliation for taking measures to prevent contractor fraud against the United States.  *Id*. § 3730(h).  The relevant part of this provision states:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

*Id.* The purpose of § 3730(h) is to promote enforcement of the FCA by "assur[ing] those who may be considering exposing fraud that they are legally protected from retaliatory acts." S. Rep. No. 99-345, at 34, 1986 U.S.C.C.A.N. 5266, 5299 (1986). Congress "recognize[d] that few individuals will expose fraud if they fear their disclosures will lead to harassment, demotion, loss of employment, or any other form of retaliation," and, accordingly, sought "to halt companies and individuals from using the threat of economic retaliation to silence 'whistleblowers.'" *Id.*

In order to bring a FCA retaliation claim in the Fourth Circuit, a plaintiff must prove that: (1) he engaged in protected activity by taking action in furtherance of a *qui tam* suit; (2) his employer had notice of those acts; and (3) his employer took adverse action against him as a result of these acts. *See Mann v. Heckler & Koch Defense, Inc.*, 630 F.3d 338, 343 (4th Cir. 2010). Defendant primarily challenges the third element, arguing that Plaintiff has not adequately pled a causal

13

link between his alleged protected activity and the alleged adverse actions taken against him.  (Mem. at 1, 5.)  Defendant also challenges the first element, albeit in a footnote, claiming that Plaintiff's investigation into Defendant's timekeeping does not constitute protected activity because there was no distinct possibility of it leading to a viable suit under the FCA.  (Mem. at 3 n.3.)  The Court will address the first and third elements in turn.[4]

First, the Court finds that Plaintiff has sufficiently pled that he engaged in protected activity.  Under the terms of § 3730(h), the first element of a FCA retaliation claim requires a plaintiff to show that he took "lawful acts in furtherance of an action filed or to be filed under this section."  31 U.S.C. § 3730(h).  Courts have recognized that the "'to be filed' language 'manifests Congress' intent to protect employees while they are collecting information about a possible fraud, before they have put all the pieces of the puzzle together." *Mann*, 630 F.3d at 343-44.  Accordingly, such conduct includes the filing of a *qui tam* suit under the FCA as well as acts leading up to or relating to a FCA suit, including "investigation for, initiating of, testimony for, or assistance in" an FCA suit.  31 U.S.C. § 3730(h).  In the Fourth Circuit, a protected activity takes place where "an employee's opposition to fraud takes place in a

---

[4] Defendant does not contest the second element of a retaliation claim, notice.

context where 'litigation is a distinct possibility, when the conduct could reasonably lead to a viable FCA action, or when . . . litigation is a reasonable possibility.'" *Mann*, 630 F.3d at 344 (quoting *Eberhardt v. Integrated Design & Contr., Inc.*, 167 F.3d 861, 869 (4th Cir. 1999)).

Here, Plaintiff has pled facts that, if proven, indicate that litigation of a FCA claim was a distinct and reasonable possibility.  Plaintiff identifies his protected activity as his complaints about and investigation into Defendant's timekeeping practices.  Plaintiff alleges that Defendant's policy was for all employees to record 12 hours of work per day on their time records, regardless of how many hours they actually had worked and that his supervisors personally instructed him to charge that amount even when he had worked less hours or no hours.  (*See* Am. Compl. ¶¶ 38, 42, 55, 58, 68.) In response to this policy and instruction, Plaintiff specifically alleges that he "complain[ed], both verbally and in writing that some of the corporate practices of DRS were wrong, and potentially illegal," that he spoke "out about the over-charging concern" to his supervisors, and "repeatedly expressed his concerns about the fraud going on." (*Id.* ¶¶ 37, 50, 65.) Assuming that this was Defendant's policy and that, as alleged, most employees did not engage in the universally claimed 12 hours of work every day, such a timekeeping policy and practice

15

would result in systematic overcharging of the government. Therefore, based on the facts known to Plaintiff at the time of his complaints and investigation into Defendant's timekeeping practices, there was a reasonable possibility that his efforts could lead to a viable FCA action.  *See Mann*, 630 F.3d at 344-45.

Second, the Court concludes that Plaintiff has pled facts supporting a causal link between his protected conduct and his termination sufficient to survive the motion to dismiss stage.  As an initial matter, the Court emphasizes that showing required at this stage of analysis is lower than the one eventually required for a plaintiff to recover on a retaliation claim.  As other courts in this circuit have recognized, "[o]bviously a plaintiff need not *prove* all elements of his claim in the complaint."  *Glynn v. EDO Corp.*, 536 F. Supp. 2d 596, 612 (D. Md. 2008) (emphasis in original) (citing *Chao v. Rivendell Woods, Inc.*, 415 F.3d 342, 349 (4th Cir. 2005) ("We reemphasize that a complaint need not 'make a case' a defendant or 'forecast evidence sufficient to prove an element' of the claim.")).  Plaintiff "is not required to show a prima facie case of retaliation at this stage" but rather "Plaintiff's allegations must allow the Court to plausibly—or reasonably—infer the existence of the prima facie elements."  *Sherlock v. Apex Sys., Inc.*, 3:12-CV-226, 2012 WL 3062708, at *3 (E.D. Va.

16

July 26, 2012).  Thus, to sufficiently plead the third element
of a FCA retaliation claim, Plaintiff's Amended Complaint must
raise a "reasonable inference that Defendant terminated
Plaintiff because he" made complaints and conducted
investigations in furtherance of a potential *qui* tam action to
be filed under the FCA.  *Id.*

The first method of demonstrating that a plaintiff's
alleged opposition caused the adverse action is by showing a
"very close" temporal proximity between the two acts.  *Clark
County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001).
Defendant argues that the lengthy amount of time in between
Plaintiff's December 2007 complaint about its timekeeping
practices and his termination in November 2009, a span of 23
months, destroys any causal connection.  Defendant rightly notes
that the length of time between Plaintiff's first instance of
protected activity and his termination is too long, on its own,
to show a casual connection.  *Id.* (stating that adverse actions
taken 20 months later "suggests, by itself, no causality at all"
and noting that even a three to fourth month gap had been found
insufficient).  Defendant, however, ignores Plaintiff's
allegation that his December 2007 complaint was not his sole
protected conduct but rather was the "first" time he "began to
speak out about the over-charging concern."  (Am. Compl. ¶ 50.)
In several different places in his complaint, Plaintiff claims

17

that he "repeatedly expressed his concerns about the fraud going on" and made "many" complaints throughout his employment, "both verbally and in writing."[5]   (*See id.* ¶¶ 37, 45, 65.)   Based on these allegations, the time span between Plaintiff's latest instance of protected conduct and the adverse action of his termination may be much shorter than the 23 month period between his *first* complaint and his termination.   Furthermore, any ambiguity in the temporal proximity between Plaintiff's protected activity and his termination is not sufficient to defeat his claim because, as discussed below, he succeeds in the second method of pleading causation.

The Court concludes that Plaintiff has pled other allegations showing a pattern of antagonism that overcomes any lack of temporal proximity.   In the absence of temporal proximity, a plaintiff may pursue the second method of showing causation by pointing to other circumstantial evidence of retaliation such as evidence of "ongoing retaliatory animus or intervening antagonism during the period between the protected

---

[5] In the hearing, Defendant argued that there is no evidence that Plaintiff made any complaints other than his first complaint in December 2007.  The Court, however, reminds Defendant that at the pleading stage Plaintiff only needs factual *allegations* that he made multiple complaints about the timekeeping fraud, not evidence of such complaints.  As cited above, Plaintiff has set out several factual allegations that he repeatedly complained throughout his employment about Defendant's policy and practice of billing for time not worked.  Whether he can prove these allegations is a question to be resolved at a later stage in this litigation.

activity and the adverse action."[6] *Hart v. Hanover Cnty. Sch. Bd.*, 3:10-CV-794, 2013 WL 1867388, at *4-5 (E.D. Va. May 2, 2013); *see Letteri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007) (holding "other relevant action may be used to establish causation" where temporal proximity is missing, including "evidence of recurring retaliatory animus during the intervening period").

In this case, Plaintiff has pled that in response to his repeated complaints over the allegedly fraudulent timekeeping policy and practices, Defendant undertook a series of antagonistic actions which culminated in the clearly materially adverse action of his termination. In the interim between Plaintiff's first complaint and his termination, he alleges the following events occurred. Plaintiff alleges that his supervisor confronted him over his accurate timekeeping following an initial discussion about his concerns. (Am. Compl. ¶ 55.) Soon after, Defendant deployed Plaintiff to the field for the first time. Plaintiff's deployment in itself might not constitute a materially adverse action given that work in the field was part of his job duties and that he initially requested to be deployed as a potential solution to his timekeeping concerns. (*Id.* ¶¶ 14-15, 51.) This deployment plausibly

---

[6] Pleading allegations of circumstantial evidence can be sufficient; direct evidence of retaliation is not required, contrary to Defendant's assertions. *See Hart*, 2013 WL 1867388, at *4.

demonstrates retaliatory animus, however, because it directly contradicted the immediately previous assessment by Plaintiff's supervisor that the Plaintiff "lacked the experience necessary to be deployed." (*Id.* ¶ 53.)  In addition, Plaintiff alleges that subsequent deployments were unnecessary and/or conducted in a manner contrary to Defendant's standard operating procedure. He alleges that his later deployment to Kandahar, following his "repeated[]" complaint about timekeeping fraud, was unnecessary because "there was no reason for DRS to be stationed at the Kandahar airfield base" and there was "no work to do" despite him being advised to charge 12 hours of work per day to the government contract while there.  (*Id.* ¶¶ 66-68.)  Moreover, Plaintiff claims that Defendant improperly deployed him to Barge Matal by sending him there without complying with the standard operating procedure of a security report.  (*Id.* ¶¶ 69-71 (asserting that his supervisor refused to provide the report and instead told him "you'll find out when you get there").)  Under the facts alleged, his deployment there also was unnecessary and dangerous as he arrived into an active combat site where, according to the military personnel there, civilians were not supposed to be.  (*Id.* ¶¶ 72-75.)  To summarize, although deployment into the field was part of Plaintiff's ordinary job duties, the thrust of Plaintiff's allegations is that Defendant deployed him in a manner that was unnecessary, contradicted its

previous assessment of his preparedness, violated its own
standard operating procedure, and, in the last instance, was
life-threatening.  Finally, despite allegedly receiving a
special commendation from military personnel for his actions
while in Barge Matal, Defendant terminated Plaintiff soon after
he arrived back in the United States from that deployment.  (*Id.*
¶¶ 76-77.)

        The Court concludes that the above factual
allegations, if viewed as a whole and assumed to be true,
provide circumstantial evidence of a pattern of antagonistic
acts and "recurring retaliatory animus during the intervening
period" which link Plaintiff's initial and subsequent protected
activity to his termination.  *Letteri*, 478 F.3d at 650.  That
is, this pattern of events raises a reasonable inference that
Plaintiff's termination was motivated by retaliatory animus.
The Court concludes, therefore, that Plaintiff sufficiently has
pled the causation element for a FCA retaliation claim at the
motion to dismiss stage "although the Court harbors some
questions regarding the ultimate viability of Plaintiff's case."
*Enoch v. Advanced Bioscience Laboratories Inc.*, 8:12-CV-03701-
AW, 2013 WL 1702646, at *4 (D. Md. Apr. 18, 2013).  The Court
warns Plaintiff, however, that "a more rigorous standard of
review applies following the development, or lack therefore, of
any evidence through discovery" in "contrast[] with the pleading

stage, where the Court must assume the truth of Plaintiff's

allegations and liberally construe Plaintiff's [Amended]

Complaint."  *Id.*

## IV.  Conclusion

For the foregoing reasons, the Court will deny

Defendant's Motion to Dismiss.

An appropriate Order will issue.

<table>
<tr><td></td><td>/s/</td></tr>
</table>

August 27, 2013              James C. Cacheris
Alexandria, Virginia     UNITED STATES DISTRICT COURT JUDGE